## THE DELAWARE.

## THE AMBROSE SNOW.

(District Court, S. D. New York. April 15, 1913.)

COLLISION (§ 100*)—STEAM AND SAILING VESSELS MEETING — CHANGE OF COURSE BY SCHOONER.

A collision in the main ship channel in New York Harbor in a fog, between a steamer passing outward and a meeting pilot schooner, *held*, on the evidence, due solely to the fault of the schooner in starboarding and going to the westward across the course of the steamer, instead of maintaining her course and speed as the privileged vessel, as required by the rules.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 213–215; Dec. Dig. § 100.*]

In Admiralty. Suit for collision by the United New York Sandy Hook Pilots' Association, as owner of the pilot boat Ambrose Snow, and others, against the steamship Delaware, the Clyde Steamship Company claimant, and cross-libel against the Ambrose Snow. Decree for cross-libelant.

Lindsay, Kalish & Palmer, of New York City (J. Culbert Palmer, of New York City, of counsel), for United New York Sandy Hook Pilots' Ass'n and the Ambrose Snow.

Burlingham, Montgomery & Beecher, of New York City (Charles C. Burlingham and Robinson Leech, both of New York City, of counsel), for the Delaware and the Clyde S. S. Co.

HAZEL, District Judge. These are cross-libels to recover damages for a collision occurring in the main ship channel in New York Harbor, near Staten Island shore, on the 23d day of May, 1912, between the schooner Ambrose Snow and the freight steamer Delaware, resulting in the sinking of the former. The vessels, which were going in opposite directions, collided late in the afternoon, while it was still daylight, in a fairly dense fog, at ebb tide, in wind blowing light in a southeasterly direction. There was a man at the wheel of the pilot boat with the master, another amidships casting the lead, and two lookout men in her bow, all pilot apprentices. At regular intervals the schooner blew three blasts of her fog horn, while the steamer, having on board a complete crew, blew her whistle at intervals as required by the rules of navigation. The fog signals, when first heard aboard the schooner, sounded ahead, and the vessels were then from 1,500 to 2,000 feet from each other.

The witnesses for libelant swear that the steamer was two points on the starboard side when she was first observed through the fog; while in contradiction of such testimony the master of the Delaware, who

---

was in the pilot house, and the first officer, and several of the steamer's crew testified that the schooner was approximately a point and a half on her port bow. Indeed, the principal dispute has arisen over the relative positions of the vessels on approaching each other; the master of the pilot boat testifying that, after hearing the fog signals of the Delaware, he starboarded a little, going to the westward, and that later, when he perceived the steamer through the fog, a point and a half on the schooner's starboard bow, he hard-astarboarded, meanwhile keeping watch of the approaching steamer. He further testified that he soon noticed that the steamer sheered slightly to port, seeming to slack away, and then quickly threw her bow over towards the schooner, coming ahead into her amidships.

The version of Capt. French of the Delaware is that, on the instant that he was made aware of the presence of the schooner in the channel, he walked from the starboard side of the steamer to the pilot house and ordered her wheel to be put hard-aport and the steamer "hooked up full speed ahead." He testified that the Snow was then about a point and a half on the port bow, and that if she had maintained her course and speed the vessels would have passed port to port 150 to 200 feet apart. It is shown that the steamer was going through the water at the rate of approximately 6¼ knots an hour, and that in obedience to the hard-aport order of her master she promptly swung to starboard. The schooner, instead of keeping her course, continued to swing gradually to the westward, and though the steamer's engines were stopped, and she was reversed full speed astern, the situation was in extremis, and as the schooner jibbed her sails she swerved further to the westward, and the collision occurred.

The movement of the steamer to the right or westward under a hard-aport wheel was not a fault; for if the schooner had kept her course, as she was required to do under the Inland Rules, the vessels would have safely passed each other. Nor, indeed, are any of the faults charged against the steamer in the libel proven. While it is true that she was required to keep out of the way of the pilot boat, and upon approaching a vessel was bound to reduce her speed, back, or stop, as the circumstances demanded, yet her failure to comply with such requirement was not the primary cause of the disaster, as the position of the schooner was fully ascertained after her fog horn had been sounded a few times. In such a situation the steamer had a right to assume that the approaching schooner would keep her course while the former maneuvered to keep out of her way. The S. C. Tryon, 105 U. S. 267, 26 L. Ed. 1026.

Taking into consideration the probabilities, I am led to think that the error in navigation was the starboarding by the schooner, which took her across the bow of the steamer. The retarded progress of the pilot boat against the tide, and the nearness of the steamer, together with the speed at which she was proceeding, made it quite probable that the vessels would pass in about a minute, and this should have prompted a stricter adherence to the rule which, while giving to the schooner the right of way, required her to keep her course and speed.

Her fault was grievous enough to bring on the collision, and to justify overlooking any fault, if there was such, in the navigation of the steamer.

The libel is dismissed, and the cross-libel sustained, with costs.